# CLARA A. GOODES, Respondent, v. ORDER OF UNITED COMMERCIAL TRAVELERS OF AMERICA, Appellant.

**St. Louis Court of Appeals. Argued and Submitted April 7, 1913. Opinion Filed May 6, 1913.**

1. **EVIDENCE: Expert Evidence: Invading Province of Jury.** In an action on an accident insurance policy, where the question of the cause of insured's death is in issue, one of the functions of an expert witness is to give his opinion of the cause of death, basing it on the hypothetical case; and such an opinion is not objectionable as usurping the province of the jury.

2. ———: ———: ———. In an action on an accident insurance policy, where the question of whether insured died from an accident resulting from a fall, or from apoplexy, was in issue, plaintiff's counsel propounded a hypothetical question to a physician, which, after hypothesizing that insured sustained a fall and other facts connected with the death, concluded with a request that the witness give his opinion of the cause of death. The witness answered that the death was the result of a concussion and compression of the brain, brought about from a hemorrhage proceeding from a fracture at the base of the skull, which fracture was caused, in the hypothetical case stated, by the fall. *Held,* that neither the question nor the answer was improper as seeking to substitute the witnesses' opinion for the verdict of the jury.

3. **TRIAL PRACTICE: Directing Verdict: When Proper.** Where the evidence given at the trial, with all inferences that the jury could justifiably draw from it, is insufficient to support a verdict for the plaintiff, so that such a verdict, if returned, would have to be set aside, the court is not bound to submit the case to the jury, but may direct a verdict for the defendant; otherwise, the case is for the jury.

4. **ACCIDENT INSURANCE: Death by Accident: Sufficiency of Evidence.** In an action on an accident insurance policy, evidence *held* sufficient to establish that insured died from bodily injury effected through external, violent and accidental means, within the provisions of the policy.

5. ———: ———: **Burden of Proof.** In an action on an accident insurance policy which provides for the payment of a certain sum if insured die from bodily injury effected through ex-

ternal, violent and accidental means, the burden of proof is on the plaintiff to show that death resulted from such means alone.

6. **EVIDENCE: Presumptions: Inferences.** It is not permissible, in a court of law, to base presumptions upon presumptions and inferences upon inferences; but it is the province of the jury to draw all proper inferences which the facts in evidence warrant.

7. **ACCIDENT INSURANCE: Death by Accident: Proximate Cause: Instructions.** In an action on an accident insurance policy, providing for the payment of a certain sum if insured die from bodily injury effected through external, violent and accidental means, where the question of whether insured died from an accident resulting from a fall, or from apoplexy, was in issue, the court instructed that, before the jury could find for plaintiff, they must find that the direct cause of insured's death was bodily injury effected through external, violent, and accidental means alone, independent of all other causes, and that his death did not happen directly or indirectly in consequence of disease, and was not caused wholly or in part by bodily infirmity or disease, and that there were external or visible evidence or marks of such accident on his body. In another instruction, the court charged that, if insured accidentally slipped and fell, and that this was the direct cause of the bursting of a blood vessel, which resulted in his death, then the fall was the direct cause of his death, notwithstanding the jury might find that he was suffering from diseased arteries, heart and kidneys. *Held*, that the instructions sufficiently charged that the accident must have been the direct cause of death, in order to authorize a recovery, especially in view of a further instruction that, if the fall was caused by apoplexy or a hemorrhage brought on by a diseased condition of the arteries, plaintiff could not recover.

8. ———: ———: **"Visible Marks" on Body.** In an action on an accident insurance policy, providing that the insurance should not cover any death "of which there shall be no external or visible marks on the body," a recovery cannot be had unless there were such marks on the body of insured; but the issuance of blood from his ear and nostril after his death is a "visible mark," within the policy.

9. ———: ———: **Diseased Condition of Insured: Contributory Cause of Death.** Where the death of insured proximately results from bodily injury effected through external, violent and accidental means, a recovery may be had under an accident insurance policy, providing for the payment of a certain sum if insured die from bodily injury effected through external,

violent and accidental means, and providing that the insurance should not cover death directly or indirectly happening in consequence of disease, or caused wholly or in part by bodily infirmities or disease, although a diseased condition contributes to the death; the question determinative of the right of recovery being that of proximate cause—if the immediate cause of death is disease, there is no liability, but if the immediate cause is an accident, there is.

Appeal from St. Louis City Circuit Court.—*Hon. J. Hugo Grimm,* Judge.

Affirmed.

*Thomas G. Rutledge* and *Augustus T. Seymour* for appellant.

(1) The burden of proof was on the plaintiff below to show that the death of insured was caused by bodily injury effected through external, violent and accidental means and that this alone caused his death. Masonic Assn. v. Shryock, 73 Fed. 774; Laessig v. Assn., 169 Mo. 272; Ins. Co. v. McConkey, 127 U. S. 661; Stanton v. Ins. Co., 78 Atl. 317; National Assn. v. Scott, 155 Fed. 92; Commercial Assn. v. Parks, 179 Fed. 794; Binder v. Acc. Assn., 127 Iowa, 25; White v. Ins. Co., 95 Minn. 77. (2) The evidence is undisputed that the diseased condition of the arteries of the insured was an essential contributing factor in causing his death, and there can be no recovery under the contract in this case. The court below erred in refusing to instruct the jury, at the close of plaintiff's evidence, to find for the defendant. Masonic Assn. v. Shryock, 73 Fed. 774; Ins. Co. v. Selden, 78 Fed. 285; Commercial v. Assn. v. Fulton, 79 Fed. 423; Hubbard v. Mut. Assn., 98 Fed. 930. (3) It is not permissible in a court of law to base inference upon inference, or presumption upon presumption. The verdict in this case rests upon a series of conjectures and not upon positive proof. Such a verdict cannot stand. Ins. Co. v. Selden, 78 Fed. 285, 288; United States v. Ross, 92

U. S. 281; Manning v. Ins. Co., 100 U. S. 695-697; National Assn. v. Scott, 155 Fed. 92-95; Bank v. Stewart, 114 U. S. 231; Cunard v. Kelly, 126 Fed. 610; Postal, etc., Co. v. Livermore, 188 Fed. 696. (4) Where the evidence is as consistent with the cause of death not accidental as with an accidental cause, the verdict should be for the defendant. Carnes v. State Assn., 106 Iowa, 281. (5) Expert witnesses may not usurp the functions of a jury, nor be permitted, in answering hypothetical questions, to state what, in their opinion, was the cause of the death of insured. Baehr v. Surety Co., 133 Mo. App. 541; Glasgow v. Railroad, 191 Mo. 361; Bragg v. Railroad, 192 Mo. 331; State v. Hyde, 234 Mo. 200; Jones on Evidence, secs. 372, 373. (6) Where the violence of the injury was not alone sufficient to account for death, and the existence of the disease is an essential factor in the fatal result, plaintiff is not entitled to recover under the terms of the contract involved in this case. Carr v. Ins. Co., 100 Mo. App. 602; Fetter v. Fidelity Co., 174 Mo. 256; Masonic Assn. v. Shryock, 73 Fed. 774; Ins. Co. v. Selden, 78 Fed. 285; Commercial Assn. v. Fulton, 79 Fed. 423; Hubbard v. Accident Assn., 98 Fed. 930.

*McDonald & Taylor* and *Jacob Chasnoff* for respondent.

(1) The trial court properly construed the contract of insurance as permitting recovery notwithstanding the fact that the insured was at the time of his death suffering from disease, if the accident proved was the sole, direct and efficient cause of the death. Beile v. Protective Assn., 155 Mo. App. 629; Driskell v. Ins. Co., 117 Mo. App. 362; Fetter v. Fidelity & Casualty Co., 174 Mo. 256; Hooper v. Life & Acc. Co., 166 Mo. App. 209, 148 S. W. ——; Modern Woodmen v. Shryock, 54 Neb. 250; Columbia, etc., Co. v. Ins. Co., 104 Mo. App. 157; Ins. Co. v. Dunlap, 160 Ill.

462; Zinc Co. v. Ins. Co., 144 Mo. App. 380; May on Insurance (2 Ed.), sec. 174. (2) A discharge of blood from ear and nostrils of insured, immediately after death from hemorrhage resulting from an accidental fall, constitutes "external and visible marks upon the body" within the requirements of the accident insurance contract sued on. Association v. Barry, 131 U. S. 100, 33 L. R. A. 60; Horsfall v. Ins. Co., 32 Wash. 132, 63 L. R. A. 425; Dent v. Railway Mail Assn., 183 Fed. 840; U. S. Mutual v. Newman, 84 Va. 52. (3) Even on defendant's theory of the measure of proof required, there is ample evidence to support the verdict. Casualty Co. v. Lloyd, 165 Ind. 62; Casualty Co. v. Shields, 155 Fed. 54; Commercial Assn. v. Fulton, 93 Fed. 621; Shonberg v. Fidelity & Casualty Co., 158 Fed. 1; National Benev. Assn. v. Grauman, 107 Ind. 288; Modern Woodmen v. Shryock, 54 Neb. 250; Patterson v. Ocean Acc. & G. Co., 25 App. D. C., ——; Beile v. Protective Assn., 155 Mo. App. 629. (4) Refusal of the trial court to grant a new trial asked for on the ground that the verdict is against the weight of evidence is not reviewable on appeal. Brod v. Transit Co., 115 Mo. App. 202; Louis v. Franckle, 158 Mo. App. 262. (5) The testimony in answer to the hypothetical question was properly admitted. Wigmore, Evidence, secs. 1920, 1921; Rogers, Expert Testimony (2 Ed.), secs. 26-28; Wood v. Railroad, 181 Mo. 433; Moore v. Railroad, 164 Mo. App. 34.

STATEMENT.—John Thomas Goodes, the husband of respondent, a man forty-seven years of age, five feet, nine and a half inches in height, weighing about 210 pounds, robust and apparently free from any disease or ailment, of simple habits, indulging in no excesses in eating or in the use of liquors, using the latter on rare occasions and then very sparingly, a light smoker until within a year and a half before his death, when he discontinued the use of tobacco alto-

gether, was on a visit with his wife at the home of a friend. He and his wife retired to their room about midnight and at about eight o'clock in the morning Mr. Goodes, leaving his wife in bed, arose and went to the bathroom to shave and take his bath. He was absent from the bedroom about thirty minutes. Following the testimony of his wife, plaintiff here, it appears that Mr. Goodes, on returning to the bedroom from the bathroom was clad in his pajamas. There was a seat about two feet high, a stool in fact, with four legs, two of them resting on the floor of the bedroom, two on a rug. Mr. Goodes went to this seat, which was in front of a dressing table, sat down and prepared to dress, he and his wife joking, laughing and talking together, she lying in bed. He took off the trousers of his pajamas and reached for his underclothing, a union suit, hanging on the frame of a mirror, which was a few feet in front of this stool, and about four or five feet high. As we understand it, he reached for this garment in a stooping position, not standing up to his full height. Taking the suit off of the post or upright of the cheval, Goodes apparently backed toward the stool and was in the act of reseating himself on it, when it slipped from under him and he fell back on the floor, striking on his buttocks. Hearing him fall, his wife raised up, looked and asked if he was hurt. He said, "No," got up from the floor, came over to the bed, sat down on the side of it, threw off the jacket of his pajamas and reached around for his wife, who was back of him. She then saw that he was hurt. She arose, grabbing hold of him, when his head fell back on her shoulder and she laid him down on the bed and called for help. As she laid him down she saw blood oozing out of his right ear and nose. Some of the people in the house, hearing the cry of Mrs. Goodes, came into the room and when the gentleman of the house reached the body, as he testified, it

showed no signs of life, and blood was exuding from one or the other of the ears and from the nose.

A physician, who was summoned and arrived immediately after the occurrence, testified that when he reached the room, he found Mr. Goodes lying on the bed, dead. He had been dead some minutes, was lying on his back, his clothing removed and blood was coming out of the ear and nostril. He recognized the case, as he testified, "as that of hemorrhage."

Some six or seven hours after the death, an autopsy was held on the body. There was testimony tending to show that the examination revealed a hemorrhage in the cavity of the skull around the brain, also hypertrophy of the heart on the right side, and a contracted condition of the kidney. It also showed some of the blood vessels to be atheromatous. There was profuse hemorrhage all through the cranium but more particularly in the ventricles of the lower section of the brain; a slight dilation of the right side of the heart; some change in the kidneys. The atheromatous condition was found in the vessels of the brain; in some of the arteries.

There was testimony to the effect that the hemorrhage from the ear and the nose had resulted from a fracture of the skull. While the surgeons who conducted the autopsy removed the brain, there was no testimony as to any examination of the interior of the skull. In point of fact it appears that the surgeons who conducted the autopsy, made no examination of the interior of the skull with the view of ascertaining whether there had been any fracture. That there had been a fracture and that this had caused the hemorrhage from the ear and nose, was opinion evidence, founded on the evidence as to the hemorrhage. It is proper to say that there was evidence on the part of defendant tending to show that there had been no hemorrhage, certainly that none was observed by those who saw the body immediately after death occurred,

either proceeding from the ear or the nostril and, as these witnesses testified, there was no evidence present on the body or about the ears or nose that there had been any such discharge. Other than this hemorrhage, testified to positively by two or more witnesses, no sign of a wound or bruise appeared upon the exterior of the body. There was opinion evidence on the part of defendant, tending to show that the cause of death was apoplexy; that a fall such as that sustained by the deceased, in the absence of a diseased condition of the heart, kidneys and blood vessels in the brain, would not have caused death; that Mr. Goodes was suffering from nephritis, commonly known as Bright's Disease; that a person may have Bright's Disease and go for a considerable length of time before a proper diagnosis is made and the fact discovered and some of them die very suddenly from it without that condition having been previously ascertained; that judging from the condition disclosed at the autopsy, Mr. Goodes had been stricken with apoplexy and that had caused him to slip and fall, and that the fall had not caused or brought on the attack.

To the contrary, there was opinion evidence on the part of the physicians and surgeons examined on the part of plaintiff, in answer to the hypothetical question which was put to them, to the effect that Mr. Goodes died from a concussion and compression of the brain brought about by hemorrhage. The hypothetical question which was asked of these experts, after setting out a description of the subject as to age, weight and height, as to his habits, and that he had been in apparent perfect health, setting out the circumstances connected with the fall, continued: That after reaching the bed as he turns and reaches, his head falling backward, "he sinks down, loses consciousness and falls over, and in a few moments blood oozes from his nostrils, and from his right ear, and after the

blood has begun to ooze from the nose and ear all breathing stops and the man is dead; that a post-mortem is held six hours later and on opening the body it appears that the deceased has a granular kidney, not granulated to a great extent, with a heart slightly dilated and the valves thereof not diseased; that he has some arteries in his brain that are atheromatous; that there is a profuse hemorrhage in the ventricles of the brain and extending throughout the brain (or, as modified, 'profuse hemorrhage around the brain'), on that state of facts, what in your opinion caused the death?" The answers of the surgeons called by plaintiff to whom this was propounded were to the effect that the subject of the question died from a concussion and compression of the brain, brought about by a hemorrhage, the hemorrhage proceeding from a fracture at the base of the skull, the fracture caused in the hypothetical case stated, by a fall upon his buttocks. On practically the same hypothetical question, surgeons called by defendant gave it as their opinion that the subject died of apoplexy and that this was not induced by the fall.

At the time of his death John Thomas Goodes was a member of the defendant society or corporation, a corporation organized under the laws of the State of Ohio, engaged in the business of life and accident insurance upon the mutual or co-operative plan, a corporation duly organized to transact business in the State of Missouri, his wife, the plaintiff, respondent here, being the beneficiary. The constitution or laws of the order provides that in case any member of the order shall sustain, during the continuance of his membership and while in good standing, "bodily injury effected through external, violent and accidental means, which alone shall occasion death immediately or within six months from the happening thereof, then the Order of United Commercial Travelers of America, within ninety days from the receipt of satisfactory proof of his death, shall pay to the person or persons en-

titled thereto, a sum not exceeding $5000," and also pay the sum of $1300 in weekly installments of twenty-five dollars each. It was provided, among other things, that the payments authorized to be made under this law should not cover or extend to any death, disability or loss resulting from various affections named, among others, fits and vertigo, "nor to any death, disability or loss, of which there shall be no external and visible mark on the body (the dead body not being such a mark except in case of drowning or asphyxiation), or happening directly or indirectly in consequence of dis, ease or caused wholly or in part by bodily infirmities or disease, . . . nor to any case except where the injury is external, accidental, and the proximate and sole cause of the death." There are various other conditions in the constitution and laws of the order be-sides the above but as the case before us turns upon the construction of these portions, it is not necessary to set out any of the other exceptions.

It may be said in passing that while there was an effort made to show that Mr. Goodes was in default in the payment of some dues to his local lodge, that has practically been abandoned; so also has any ques-tion as to due presentation of the claim.

The material parts of the answer, in effect, deny that the death was the result of external, violent and accidental causes, alleging that it occurred within the express exceptions of the constitution which defend-ant sets out, namely, that the obligation of payment should not cover or extend to any death "happening directly or indirectly in consequence of disease or caused wholly or in part by bodily infirmity or dis-ease, nor to any case except where the injury is ex-ternal, accidental, and the proximate and sole cause of the death of the deceased member." There are other defenses set up in the answer but they were practically abandoned, the affirmative defenses aban-doned either at the trial or before us, these affirma

tive averments of the answer, however, being put in issue by a reply.

We have not undertaken to set out the evidence in detail but have given a summary of it which we have taken mainly from the elaborate statement of the learned counsel for appellant, but referring also to the abstract, as it appears on an examination of that, that doubtless by inadvertence, counsel have included some questions and answers that were later excluded by the court; these, on the strength of the abstract, we have disregarded.

At the conclusion of the evidence for plaintiff and again at the conclusion of all the testimony in the case, defendant interposed a demurrer to the evidence. These demurrers were overruled, defendant excepting.

At the instance of plaintiff the court gave two instructions, numbered 1 and 2, and as follows:

"1. If the jury find from the evidence that on the 27th day of December, 1908, John Thomas Goodes was a member in good standing in the defendant corporation and that while in such standing his death occurred, and that the direct cause thereof was bodily injury effected through external, violent and accidental means, alone, independent of all other causes, within six months of the happening of such accident, and that such death did not happen directly or indirectly in consequence of disease and was not caused wholly or in part by bodily infirmity or disease, and that there were external and visible evidences or marks of such accident on the body of the deceased, and that the defendant, after notice of said death and presentation of claim, disclaimed all liability on other grounds than want of sufficient proofs of death, then plaintiff is entitled to recover the sum of $6300 with interest thereon from the  22d day of June, 1909, to this date, at the rate of six per cent per annum.

"2. If the jury find from the evidence that John Thomas Goodes accidentally slipped and fell from a

stool and that such fall was the direct cause of a burst-
ing of the blood vessels in the brain which resulted in
his death, then the fall was the direct cause of death,
notwithstanding the jury may find that said Goodes
was suffering from diseased arteries, heart and kid-
neys.''

At the instance of defendant the court gave two
instructions, number 3 and 4, as follows:

''3. The court instructs the jury that the plaintiff
is not entitled to recover in this action unless the said
John Thomas Goodes came to his death on or about
the 27th day of December, 1908, as the result of exter-
nal, violent and accidental means, alone, independent
of all other causes, and the burden of proof is upon the
plaintiff to establish to the satisfaction of the jury
that the death was caused by external, violent and ac-
cidental means alone, independent of all other causes;
and unless you believe that the plaintiff has established
by a preponderance of the testimony that the death
of said Goodes was caused by external, violent and
accidental means, alone, independent of all other causes,
that then your verdict must be in favor of the de-
fendant.

''4. The court instructs the jury if they find from
the evidence that John Thomas Goodes did slip, fall or
wrench his body in any way, and that such occurrence
was caused by apoplexy or a cerebral hemorrhage
brought on by a diseased condition of his arteries, the
plaintiff cannot recover.''

Of its own motion the court gave an instruction
numbered 5, that before the jury could find the issues
for plaintiff, ''they must find that the alleged accident
to Mr. Goodes, that is to say his falling to the floor
while attempting to sit down upon a dressing seat, was
the direct and efficient cause of the death of the in-
sured.''

The court also correctly instructed the jury as to the credibility of witnesses and as to the number of jurors necessary to concur in a verdict.

The defendant asked eight instructions which were refused. The substance of these refused instructions is that if the jury found that the decedent, John Thomas Goodes, slipped, fell or wrenched his bodily while suffering from a diseased condition of the arteries which existed prior thereto, and that his death would not have resulted from such slipping, falling or wrenching of his body in the absence of such diseased condition, or that the diseased condition aggravated the effects of the accident and contributed to his death, then plaintiff could not recover; that the contract of the defendant order provides that it shall not be liable for any death happening directly or indirectly in consequence of disease or caused wholly or in part by bodily infirmities or disease, and that even if the jury found from the evidence that Goodes slipped and fell or wrenched himself, if they found from the evidence that he had a diseased condition of the arteries and that that diseased condition aggravated the effects of the accident and contributed to his death, then by the express terms of the contract there was no liability on the part of the defendant; that if they found that Goodes suffered an accident and died as a result of a ruptured artery in the brain and that at and prior to the date of the accident he had a diseased condition of the arteries and that the accident was not of sufficient force and violence to cause a fatal rupture of the arteries in the absence of such diseased condition, plaintiff could not recover, and their verdict should be for defendant. Other instructions were asked as to the binding effects of the proofs of death submitted and as to the standing of John Thomas Goodes in the order, but as no point is made in the assignment of errors on the refusal of these or on these issues, it is unnecessary to notice them.

The jury returned a verdict for plaintiff in the sum of $7003.50. Interposing a motion for new trial and one in arrest and saving exceptions to 'the overruling of these motions, defendant has duly perfected its appeal to this court.

REYNOLDS, P. J. (after stating the facts).—The only questions before us for determination are as to the sufficiency of the evidence in the case to sustain a verdict; the correctness of the ruling of the trial court in overruling demurrers at the close of plaintiff's case and at the close of all the evidence in the case; objection to the testimony of certain expert witnesses called by plaintiff, and to the form of the hypothetical question asked by plaintiff; to the verdict, as based upon presumptions upon presumptions and inferences upon inferences; to the giving of plaintiff's second instruction; to giving the instruction number 5 of the court's own motion; to refusing instructions asked by defendant.

Disposing of the error assigned as to the correctness of the hypothetical question and the answers to it, we find no error in the question, nor do we think that the contention of the learned counsel for appellant, that the question and answers had a tendency to substitute the opinions and conclusions of the surgeons for the verdict of the jury, is sound. We do not agree with the learned counsel that the answers were mere conclusions, in the technical sense of that word. They constituted opinion evidence in the true sense of of that term and were the very kind of evidence that the use of expert witnesses is intended to and should adduce.

Counsel argue that expert witnesses "may not usurp the functions of the jury, nor be permitted, in answering hypothetical questions, to state what, in their opinion, was the cause of the death of insured." This is only partially correct. One of the functions,

in fact the only function of an expert witness, is to give his opinion of the cause of death, basing that on the hypothetical case.

We are very much inclined to agree with Mr. Wigmore (3 Wigmore on Evidence, secs. 1920-1922, inclusive) in his criticism of the use of the phrase, "usurping the function of the jury," and of the kindred phrase, "that an opinion can never be received when it touches 'the very issue before the jury,'" the latter stated in the form that "it is a general rule that a witness cannot be allowed to express an opinion upon the exact question which the jury are required to decide." It can hardly be said that the opinion evidence of experts usurps the function of the jury, for even without a specific instruction to that effect, any ordinarily intelligent jury understands that "opinion evidence," while intended to advise the lay mind, is advisory only and not binding. Nor does "opinion evidence" in any case, *determine* the issue; it is not entered as of the verdict nor as the judgment of the court. So that it is a little difficult to understand how it can ever be said to usurp the function of the jury. In the case at bar, we find no infringement of the rule as to the admission of opinion evidence. To the contrary we are of the opinion that the rules governing such testimony, as laid down by our Supreme Court in Wood v. Metropolitan Street Ry. Co., 181 Mo. 433, 81 S. W. 152; Taylor v. Grand Ave. Ry. Co., 185 Mo. 239, 84 S. W. 873; State v. Hyde, 234 Mo. 200, 136 S. W. 316, and by the Kansas City Court of Appeals in Thomas v. Metropolitan St. R. Co., 125 Mo. App. 131, 100 S. W. 1121; Holtzen v. Missouri Pac. Ry. Co., 159 Mo. App. 370, 140 S. W. 767, and Moore, Admr., v. Missouri Pac. Ry. Co., 164 Mo. App. 34, 147 S. W. 488, were observed.

Turning to the demurrers to the evidence, we have to say as to the action of the trial court in overruling these demurrers, that unless it is to be held as a mat-

ter of law that the fact that John Thomas Goodes had
a diseased body which rendered him more susceptible
to accident, or which would make a slight fall produce
fatal results, bars recovery, a proposition which we
will take up later, there can be no question whatever
that there was testimony of a very substantial kind
warranting the jury in finding that the death was the
result of external injuries alone, received in, the re-
sult of, an accident. All the authorities, even those
cited by counsel for appellant and hereafter referred
to on other points, hold that where the evidence given
at the trial, with all the inferences that the jury could
justifiably draw from it, is insufficient to support a
verdict for the plaintiff, so that such a verdict, if re-
turned, must be set aside, the court is not bound to
submit the case to the jury, but may direct a verdict
for the defendant, otherwise, the case is for the jury.
See Randall v. Baltimore & Ohio R. R. Co., 109 U. S.
478; where that rule is well and concisely stated. It
cannot be pretended in the case at bar that the evidence
was so clearly all one way on this issue, that there could
be no difference as to its effect in the minds of reason-
able men. The whole conduct of the defense, in its
line of pleading and at the trial, negatives any such
conclusion. The demurrers were properly overruled.

This brings us to a consideration of the instruc-
tions. No error is assigned on the first instruction
given at the instance of plaintiff, nevertheless we have
set it out in full, as the instructions given, as well as
the action of the trial court in refusing others, are,
generally, necessarily to be considered in arriving at
a full understanding of the case. The errors assigned
are to the second instruction given at the instance of
plaintiff, to the fifth given by the court of its own mo-
tion, and to the action of the court in refusing certain
instructions asked by defendant.

It will be noticed that the first instruction given
covers the whole case and squarely meets the issue ten-

dered by the learned counsel for defendant, namely, that plaintiff is entitled to recover if the jury found that the fall was the direct cause of the bursting of the blood vessel in the brain which resulted in the death of John Thomas Goodes, but that plaintiff could not recover if death happened directly or indirectly in consequence of disease. The second instruction given at the instance of plaintiff puts this matter in a more concrete form. "If," says the court, "such fall was the direct cause of a bursting of the blood vessels in the brain which resulted in his death, then the fall was the direct cause of death, notwithstanding the jury may find that said Goodes was suffering from diseased arteries, heart and kidneys." This presents the issue and covers the defense interposed in the most distinct and sharpest manner possible and is in direct negation of all the instructions asked by defendant and refused by the court. If this instruction, in connection with the first given at the instance of plaintiff, is correct, then none of the instructions asked by defendant should have been given. They presented a diametrically opposite theory. Hence the issue and the determination of this case depends upon the determination of the correctness of these instructions in connection with the others which were given. If these instructions and the fifth, given by the court, are correct, the verdict must stand; if incorrect, then there should be a reversal.

Before taking up the discussion of this proposition, however, it is as well to say that we concede that the burthen of proof was on plaintiff below to show that the death of the insured was caused by bodily injury effected through external, violent and accidental means, and that this alone caused his death. We further concede that it is not permissible in a court of law "to base presumptions upon presumptions and inferences upon inferences." The first instruction which the court gave to the jury at the instance of plaintiff

recognized the first proposition in unmistakable terms, and, as before remarked, no complaint is made of this instruction. We are unable to agree that in the case at bar the jury, in arriving at its verdict, were compelled "to base presumptions upon presumptions and inferences upon inferences." The jury were proceeding upon neither presumptions nor inferences but upon affirmative, positive testimony, distinctly laying before them the facts connected with the accident, connected with the death of John Thomas Goodes, and it was unnecessary for them to indulge in either inference or presumption and we have no reason to assume that they acted on either. This does not mean that the jury did not have the right to, and did not draw any and all proper inferences which the facts in evidence warranted. That is always within their province.

It is further claimed that where the evidence is as consistent with the cause of death not accidental as with an accidental cause, the verdict should be for the defendant. Whatever force there may be in this aphorism, we are unable to appreciate its application to the case at bar. The jury were told in plain and unmistakable terms by the first and practically in the second instruction given at the instance of plaintiff, as well as those given for the defendant, that before they could find for plaintiff they must find from the evidence in the case that John Thomas Goodes came to his death while a member of the order in good standing "and that the direct cause thereof was bodily injury effected through external, violent and accidental means, alone, independent of all other causes, . . . and that such death did not happen directly or indirectly in consequence of disease and was not caused wholly or in part by bodily infirmity or disease, and that there were external and visible evidences or marks of such accident on the body of the deceased;" that they must further find from the evidence that "John

Thomas Goodes accidentally slipped and fell from a stool and that such fall was the direct cause of a bursting of the blood vessels in the brain which resulted in his death," the court telling the jury in the second instruction that if he fell and burst a blood vessel, "then the fall was the direct cause of death, notwithstanding the jury may find that said Goodes was suffering from diseased arteries, heart and kidneys." It is difficult to understand how the court could have put more plainly to the jury the proposition that they were to determine that the accident was the sole, direct and proximate cause of the death of John Thomas Goodes. There is no confusion here; no diverting of the minds of the jurors. They were told distinctly that unless the accident was the direct cause of the death there could be no recovery, and that if his fall "was caused by apoplexy or a cerebral hemorrhage brought on by a diseased condition of his arteries, the plaintiff cannot recover."

They were further told by the first instruction that they must find that there were external or visible evidences of accident or marks on the body of the deceased. That is a correct proposition, as will be seen by reference to United States Mutual Accident Assn. v. Barry, 131 U. S. 100, l. c. 111, and United States Mutual Accident Assn. v. Newman, 84 Va. 52, l. c. 56, as well as in other cases cited by counsel. In the Barry case, supra, the district judge who tried the case, in charging the jury, said: "Visible signs of injury, within the meaning of this certificate, are not to be confined to broken limbs or bruises on the surface of the body. There may be other external indications or evidence which are visible signs of internal injury. Complaint of pain is not a visible sign, because pain you cannot see. Complaint of internal soreness is not such a sign, for that you cannot see, but if the internal injury produces, for example, a pale and sickly look in the face, if it causes vomiting or retching, or bloody

or unnatural discharges from the bowels, if, in short, it sends forth to the observation of the eye, in the struggle of nature, any signs of the injury, then those are external and visible signs, provided they are the direct results of the injury." This part of the charge was approved by the Supreme Court.

There was direct evidence in the case at bar, contradicted it is true, that blood issued from the ear and nostril of the deceased. That was a visible sign.

With these incidental propositions, as we may call them, disposed of, we return to the consideration of that involved in the giving of the second instruction at the instance of plaintiff and the fifth given by the court of its own motion, and the refusal of the instructions asked by defendant, which, in brief, as before stated, presents the question as to the propriety of the jury taking into consideration the diseased condition of the arteries, heart and kidneys of John Thomas Goodes in arriving at the determination of the question as to whether the fall was the direct cause of his death.

In support of their contention that but for the diseased condition of his body the accident would not have caused the death of John Thomas Goodes and that if that was so there could be no recovery, we are cited by the learned counsel for appellant to the cases of National Masonic Accident Assn. v. Shryock, 73 Fed. 774; Travelers' Ins. Co. v. Selden, 78 Fed. 285; Commercial Travelers' Mut. Accident Assn. v. Fulton, 79 Fed. 423; Hubbard v. Mut. Accident Assn., 98 Fed. 930. We are also cited by these counsel to Carr v. Pacific Mut. Life Ins. Co., 100 Mo. App. 602, 75 S. W. 180 and Fetter v. Fidelity & Casualty Co., 174 Mo. 256, 73 S. W. 592, in addition to these cases, in support of the proposition that when the violence of the injury was not alone sufficient to account for death, and the existence of the disease is an essential factor in the fatal result, plaintiff is not entitled to recover under

the terms of the contract involved in this case. Western Commercial Travelers' Assn. v. Smith, 85 Fed. 401, is also cited. It is true that the Kansas City Court of Appeals, in Carr v. Pacific Mut. Life Ins. Co., supra, did hold, following Commercial Travelers' Mut. Accident Assn. v. Fulton, supra, that under a policy of accident insurance which provides that it shall not extend to or cover accidental injuries or death resulting from or caused directly or indirectly, wholly or in part, by disease in any form, there can be no recovery for the death of the insured if he had a disease but for which death would not have resulted from the accident. The Kansas City Court of Appeals further cites in support of this National Masonic Accident Assn. v. Shryock, supra, and other cases which so decide, notably Travelers' Ins. Co. v. Selden, supra; Commercial Travelers' Mut. Accident Assn. v. Fulton, supra; and Hubbard v. Mut. Accident Assn., supra.

The opinion in the Carr case, supra, was handed down June 8, 1903. Two months before that, namely, on April 1, 1903, our Supreme Court handed down its opinion in Fetter v. Fidelity & Casualty Co., supra. It is not referred to in the Carr case and in all probability was not called to the attention of the Kansas City Court of Appeals when it handed down its decision in the Carr case, affirmed in Strode v. St. Louis Transit Co., 197 Mo. 616, l. c. 621, 95 S. W. 851. We think that the decision in the Fetter case is contrary to that of the Kansas City Court of Appeals in the Carr case, and as we shall hereafter show, does not sustain but is adverse to the claim of appellant. We had occasion to consider the Fetter case in the case of Beile v. Travelers' Protective Assn., 155 Mo. App. 629, 135 S. W. 497. In the Beile case we held, in effect, that the policy in question excepted from its provisions of indemnity death caused wholly or in part by bodily or mental infirmity or disease. This language we held means nothing more than

that the plaintiff, to recover, was only bound to prove
that the accident and not the infirmity with which the
insured was afflicted, was the proximate cause of death.
In the Beile case we referred to and quoted approv-
ingly Driskell v. United States Health & Accident Ins.
Co., 117 Mo. App. 362, 93 S. W. 880. There the policy
provided, in effect, that it was payable only and in
case death should result solely from external injuries,
and it was said, and this we quoted approvingly in the
Beile case (1. c. 646) that "the only reasonable inter-
pretation to be placed upon this clause is to say that
the injury must stand out as the predominant factor
in the production of the result and not that it must
have been so virulent in character as necessarily and
inevitably to have produced that result, regardless of
all other conditions and circumstances. . . . When
evidence is introduced that points to the injury as the
sole active force that brings into operation death-pro-
ducing agencies, the issue of the proximate cause is
one of fact for the jury and not of law for the court."
That our brethren of the Kansas City Court of Ap-
peals fell in line with what we understand to be the
decision of our Supreme Court in the Fetter case,
seems very clear from a consideration of the decision
of that court in Hooper v. Standard Life & Accident
Ins. Co., 166 Mo. App. 209, 148 S. W. 116. In that
case the trial court instructed the jury that if they
found and believed from the evidence that Hooper was
stricken with apoplexy while riding in the street car
and that he was so stricken either while sitting in a
seat or in an attempt to arise therefrom, and that such
apoplexy caused his death, then it was the duty of the
jury to return a verdict in favor of defendant, and
that if the jury should believe from the evidence that
the death of Mr. Hooper was caused by apoplexy re-
sulting from a diseased condition of his body, it was
their duty to return a verdict in favor of defendant,
*"regardless of all other questions in the case."* These

dence of defendant it might appear that the deceased had died from apoplexy caused by a diseased condition, that is that he would not have died but for that condition and therefore under the terms of the instruction the verdict must be for defendant, yet the evidence for plaintiff was to the effect that if the accident of his falling had not happened he would not have been stricken with apoplexy. So that ''the effect of the instruction'' (given at the instance of defendant), says Judge ELLISON, ''was to cut out plaintiff's theory of her case; especially when there was added (by the court) the words (to the fourth instruction) 'regardless of all other questions in the case.' '' It is clear, we think, that the Kansas City Court of Appeals has here greatly modified the view taken in the Carr case by this decision in the Hooper case.

The leading case sustaining the position taken by counsel for appellant here is that of National Masonic Accident Assn. v. Shryock, supra, hereafter referred to as the Shryock case. In that case it is said that under an accident policy, practically with like conditions as in the case before us, the insurer would not be liable, if at the time of the accident, the insured was suffering from a pre-existing disease, and death would not have resulted from the accident in the absence of such disease, but that the insured had died because the accident aggravated the effect of the disease or the disease aggravated the effects of the accident. ''The death,'' says Judge SANBORN, who delivered the opinion, ''in such a case would not be the result of the accident alone, but it would be caused partly by the disease and partly by the accident, and the contract exempted the association from liability therefor.'' , Several cases are cited by the learned circuit judge in support of this proposition. Following this are the Federal decisions which we have above referred to as relied upon by counsel for appellant, namely, Travelers' Ins. Co. v. Selden, supra; Com-

mercial Travelers' Mutual Accident Assn. v. Fulton, supra; Western Commercial Travelers' Assn. v. Smith, supra; and Hubbard v. Mutual Accident Assn., supra.

Travelers' Ins. Co. v. Selden, supra, while referring to the Shryock case, supra, can hardly be said to be applicable, as the undisputed evidence of the case, even that on the part of plaintiff there, who was defendant in error, showed that the death was the result of apoplexy, and there was no evidence tending to show that the deceased had been injured through any external, violent or accidental means whatever. On this showing the circuit court of appeals very properly held that the trial court should have directed the jury to find for the defendant on the rule announced by Mr. Justice GRAY in Randall v. Baltimore & Ohio Railroad Co., supra. What is said in this Selden case about the Shryock case, supra, therefore, was outside of the decision.

Commercial Travelers' Mutual Accident Assn. v. Fulton, supra, it may be conceded, practically adopts the view previously expressed by Judge SANBORN in the Shryock case.

Western Commercial Travelers' Assn. v. Smith, supra, while adopting the view expressed in the Shryock case on the above point, resulted in favor of the plaintiff below.

Hubbard v. Mutual Accident Assn., supra, a decision by a district judge holding circuit court, follows the Shryock case on this proposition.

It has been said in criticism of the Shryock case, supra, that this particular part of it is obiter in that case. However that may be, it undoubtedly has been followed in other cases by the Federal courts. It was cited by the Kansas City Court of Appeals in the Carr case, supra, approvingly. It was called to the attention of our Supreme Court in the Fetter case by counsel who represented the appellant in that case, but

while not referred to by name by our Supreme Court in its opinion in the Fetter case, obviously was not accepted.

On practically a like policy or certificate of membership as that involved in the Shryock case, which had been before the United States Circuit Court of Appeals, and involving the same accident and to the same individual the question which had been before the Federal court came before the Supreme Court of Nsbraska, in the case of Modern Woodmen Accident Assn. v. Shryock, 54 Neb. 250, hereafter referred to as the Modern Woodmen case. Both policies or certificates were issued in Nebraska and were Nebraska contracts. In the Modern Woodmen case, referring to the Shryock case, the Supreme Court of Nebraska, on careful consideration and examination of the authorities cited by Judge SANBORN in support of his views, explicitly refused to follow him on the proposition here involved, analyzing the cases cited by Judge SANBORN and citing many authorities, not only from the reports of the State of Nebraska but elsewhere in support of the contrary view. In the Modern Woodmen case, following the practice in Nebraska, the trial court had submitted certain special interrogatories to the jury which the jury were required to answer. The first interrogatory is, Did Shryock, on the day named, meet with an accident in the city of Omaha, whereby he received external and violent bodily injury? To this the jury returned the answer, "Yes." Second. Did Shryock, prior to and at the time of his death, have fatty degeneration of the heart? The jury answered, "Yes." Third. "If you answer that William B. Shryock received an accidental, external, and violent bodily injury, did that injury alone cause his death?" The jury answered, "Yes." Fourth. "If you answer that William B. Shryock, prior to and at the time of his death, had fatty degeneration of the heart, did that disease alone cause his death?" The

instructions are held by the Kansas City Court of Appeals to have been erroneous; that while from the evi-jury answered, "No." Fifth. "What was the cause of the death of William B. Shryock?" The jury answered, "By violent bodily injury, he at the time having fatty degeneration of the heart."

There was a verdict for the plaintiff Shryock and it was from the judgment on this the appeal was taken to the Supreme Court of Nebraska. Entirely disagreeing with the conclusion arrived at by the United States Circuit Court of Appeals in the Shryock case, on a like certificate and the same accidental death, the conclusion arrived at by the Supreme Court of Nebraska was that whether an accident or a disease caused the death of a party whose life was insured against death by accident, was the sole question which should be submitted to and determined by a jury; unless with reference to that proposition the proofs are so convincing that all reasonable men, in the fair exercise of their judgment, would be brought to adopt the same conclusion. In other words, the conclusion of the Supreme Court of Nebraska is that the fact that at the time of sustaining the accident the deceased may have had other diseases, does not bar a recovery, if the accident in itself, and not these diseases, was the sole cause of the death. We refer to this decision of the Supreme Court of Nebraska without further quotation, as a sufficient answer, in our minds, to the argument advanced in the United States Circuit Court of Appeals in the Shryock case. While we are not bound or controlled by the decisions of either of these courts, we recognize them as composed of judges of great ability, and as between them we accept that of the Supreme Court of Nebraska as in harmony with the decisions of our own courts as expressed in the cases heretofore cited, particularly with the decision of our Supreme Court in the Fetter case, supra. In this latter case Judge VALLIANT, who delivered the opinion,

holds that where it is agreed in an accident policy to pay in case the injuries resulted in the death of the insured and it appears that they are sustained through external, violent and accidental means, independent of all other causes, the causes meant are the proximate or direct, not the remote causes; such a policy meaning that the accident must be the sole and only direct cause of the insured's death, and does not mean that the beneficiaries cannot recover, if the accident hastened on or accelerated some hidden or hitherto concealed disease so as to cause death, or if the accident superinduced or generated a disease which caused his death.

It is not out of the way to call attention to the fact that this same view, entertained by our Supreme Court and announced in the Fetter case, and by our court in the Driskell and Beile cases, supra, has not only the support of the decision of the Supreme Court of Nebraska in the Modern Woodmen case, supra, but finds support in at least two decisions of the English courts. One of these is by its Court of Appeals in the case of Winspear v. The Accident Insurance Co., Limited, 6 Q. B. Div. Law Reports (1880-1881), 42. It appears, as stated by Lord Chief Justice COLERIDGE, that the insured died from drowning in the waters of a brook into which he fell whilst in an epileptic fit. Drowning, says the learned chief justice, within the meaning of the policy, is a death "by accidental, external and visible means." "I am therefore of opinion," says the chief justice, "that the injury from which he died was a risk covered by this policy, and the only question then remaining is whether the case is within the proviso which provides that the insurance 'shall not extend to death by suicide, whether felonious or otherwise, or to any injury caused by or arising from natural disease, or weakness or exhaustion consequent upon disease.' It is certainly not within the first part of this proviso, because the death was not so occasioned; neither does it appear to me that the cause of the

death was within those latter words of the proviso. The death was not caused by any natural disease or weakness or exhaustion consequent upon disease, but by the accident of drowning. I am of opinion that these words in the proviso mean what they say, and that they point to an injury caused by natural disease, as if for instance in the present case, epilepsy had really been the cause of the death. The death, however, did not arise from any such cause, and those words have no application to the case, and therefore the judgment of the Exchequer Division must be affirmed.''

The other English case is Lawrence v. Accidental Insurance Co., 7 Q. B. Div. Law Reports (1880-1881), 216, a case in which the insured, while at a railway station, was seized with a fit and fell forwards off the platform across the railway, when an engine and cars which were passing went over his body and killed him. The Queen's Bench Division, Lord COLERIDGE, Chief Justice, presiding, held that the death of the insured was caused by an accident within the meaning of the policy and that the insurers were liable. The principal opinion was delivered by Mr. Justice DENMAN. Mr. Justice WILLIAMS, in a concurring opinion, refers to the well known maxim of Lord BACON which, as Mr. Justice WILLIAMS says, ''is applicable to all departments of the law,'' and directly applicable to the case before the court. He quotes Lord BACON's language in his Maxims of the Law, Reg. 1, as running thus: ''It were infinite for the law to consider the causes of causes, and their impulsions one of another; therefore it contenteth itself with the immediate cause.'' Applying this, Mr. Justice WILLIAMS says that according to the true principles of law we are to look at only the immediate and proximate cause of death, ''and it seems to me to be impracticable to go back to cause upon cause, which would lead us back ultimately to the birth of the person, for if he had never been born the accident would not have happened.''

It will be observed that the questions submitted in the Modern Woodmen case, calling for special findings by the jury, practically put the case before the jury in the exact light and on the same issue that the trial court in the case at bar put this case by the instructions given. It follows that it would have been error to have given any of the instructions asked by defendant, appellant here, and which we have set out as refused. They were properly refused as submitting to the jury a case not within the terms of the policy.

It is to be remembered in cases of accident insurance, no physical examination is made, no warranties of health required or given. Certainly none appear to have been in the case before us. There is no pretense of warranties of health or physical condition having been exacted from the insured. He was accepted as a risk in the condition in which the company found him at the time, with the explicit provision, however, that to make the company liable, the death must result solely from accident. It cannot be successfully argued, as is here in effect attempted, that any distinction is to be made or exemption claimed because the subject of the accident was more liable to die from accident, being in one physical condition or in another. We all know, it is a matter of common experience and common knowledge, that if a young man twenty-five years of age breaks a limb the broken limb knits much more rapidly and completely in a man at that age than in one of the age of fifty years. Men 70 years of age or over are not usually insured by accident companies. Parallels might be run indefinitely in this line. Injury to a perfectly healthy man is never as apt to result fatally as in the case of a man who is weakened by disease, or where one man is much stronger, physically, than another.

While there was testimony from surgeons called by the defendant, to the effect that in their opinion Mr. Goodes died of apoplexy and not from the effects

of the fall, none of them would be held to give it as an opinion that death would have occurred when it did but for the fall. That must be so, for who, expert or layman, whose opinion would be of any probative force, could be accepted as giving testimony of any value, if, with the facts developed by the autopsy, he should undertake to say that any of the ascertained conditions would—absent the accident—have produced the death at this time. Men have lived for many years with Bright's Disease, impaired arteries, unsound heart, diseased conditions far more advanced than here found. So that, at the end, we must face this question, Did Mr. Goodes die from disease present in his system, or from the accident? If from the disease, there would be no liability; if from the accident, liability was imposed. This was the question submitted to the jury by proper instructions. It was for them to answer it under the evidence. They answered it in favor of the plaintiff.

If this company had wished to place its risk on the line of health or physical condition, or age, it should have done so in its contract; its rates would probably have been adjusted accordingly. It did nothing of the kind. It expressly contracted that it would not pay if the death was the result of disease; it expressly contracted to pay if death resulted solely from external accident. That was the issue that was fairly submitted to the jury in this case, submitted in such distinct terms by the instructions given at the instance of plaintiff and defendant, that it was impossible for them to have erred as to the law given them by the court. Under those instructions, warranted by the law and the evidence, their verdict is conclusive upon us.

We see no error in the conduct of the trial, either as to the admission of testimony or the giving or refusal of instructions.

The judgment of the circuit court is affirmed. *Nortoni* and *Allen, JJ.,* concur.